Filed 1/15/25  P. v. Chavez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D083627 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD296545) |
| FRANCISCO M. CHAVEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Carlos O. Armour, Judge.  Affirmed.

James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

Francisco Manriquez Chavez appeals the judgment after a jury convicted him of assault with a deadly weapon other than a firearm (Pen.

Code, § 245, subd. (a)),[1] burglary of a locked motor vehicle (§ 459), vandalism over $400 (§ 594, subds. (a), (b)(1)), vandalism under $400 (§ 594, subds. (a), (b)(2)(A)), and misdemeanor resisting an officer (§ 148, subd. (a)) and found true the allegations that he personally inflicted great bodily injury (§ 12022.7, subd. (a)) and personally used a dangerous and deadly weapon (§ 1192.7, subd. (c)(23)).

Chavez makes three arguments on appeal. First, he contends insufficient evidence supported the trial court's pretrial determination that he was mentally competent to stand trial, and that the testimony of court-appointed psychiatrist Dr. Nicolas Badre, who found Chavez competent, was inadmissible because Dr. Badre conducted his forensic interviews by video. Second, Chavez contends the trial court prejudicially erred in rejecting his requested pinpoint instruction on accident. Third, Chavez contends the prosecutor committed misconduct in closing arguments by impugning defense counsel.

We conclude that Chavez forfeited his argument regarding the admissibility of Dr. Badre's testimony and substantial evidence supported the trial court's competency finding. We also conclude that the trial court did not err in refusing to give Chavez's requested pinpoint instruction and, even assuming error, it was not prejudicial. Finally, we conclude that the prosecutor did not commit misconduct. We therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Pretrial Determination of Competency*

In October 2022, Chavez was charged with assault with a deadly weapon, burglary, two counts of vandalism, and resisting an officer. The complaint further alleged that Chavez personally inflicted great bodily

---

[1]     Undesignated statutory references are to the Penal Code.

2

injury, personally used a deadly weapon, was ineligible for probation, and had two separate strike priors. Soon after Chavez was charged, his counsel expressed doubt as to his competency to stand trial and asked the trial court to suspend criminal proceedings under section 1368. The court suspended criminal proceedings, ordered that a competency hearing be held, and scheduled a mental competency examination for Chavez.

Dr. Badre, a psychiatrist with the San Diego County forensic evaluation unit, evaluated Chavez for the first time in December 2022. Dr. Badre conducted the examination by video. Dr. Badre filed a report with the court opining that Chavez was mentally competent to stand trial.

Chavez was also evaluated by an independent psychologist at defense counsel's request. Dr. Morgan Shaw met with Chavez in person in March 2023 and submitted her evaluation of Chavez, opining that he was not competent to stand trial.

In June 2023, Dr. Badre evaluated Chavez again after reading Dr. Shaw's report. He filed a second report with the court and again opined that Chavez was mentally competent to stand trial.

Dr. Shaw also evaluated Chavez again after reading Dr. Badre's second report. She found that Chavez "presented very similar to the first session," so her opinion of his lack of competency remained the same.

Dr. Shaw and Dr. Badre both testified at Chavez's competency hearing in July 2023.

1. *Dr. Shaw's Testimony*

When Dr. Shaw interviewed Chavez, she immediately observed some "very unusual behaviors," including "kind of odd, intense eye contact," "shaking," and periods where he would stare off, not saying anything. It was very difficult to keep him focused on the specific topic at hand and to keep a

3

linear timeline. There was a "general theme" of Chavez feeling as though he and his family had been targeted by the police, which "essentially kind of ruined his life."

Chavez was able to list in general the charges against him in this case, and he had a "cursory understanding" of the roles of the judge, prosecutor, and defense attorney, but "the deeper [Dr. Shaw] tried to explore his understanding of those . . . more of the persecutory beliefs and reality distortions would come out." When asked about Chavez's verbal skills, Dr. Shaw stated: "They were very variable. You know, at times they were very -- his speech was very pressured. It was rapid. At times it could be very disorganized, and then other times it could be more linear. . . . He would get derailed. He would lose his train of thought a lot. And when I would try to redirect him or ask him to repeat some of the things he said, he had a very difficult time doing so." There was also "a lot of inappropriate laughing."

Dr. Shaw noticed "pretty stark differences" between how she observed Chavez and how Dr. Badre described Chavez in his report. She believed that the virtual format of Dr. Badre's interviews with Chavez likely had an impact on his evaluations, because "it can be more challenging to pick up on some of those nuanced behavioral observations," like Chavez's shaking and lack of eye contact, and because there is "increased difficulty at times building rapport" with an inmate in a virtual setting. Chavez made it clear that he disliked Dr. Badre, describing him to Dr. Shaw as "rude and condescending," which Dr. Shaw opined made it "much less likely" that Chavez would "engage appropriately in the interview" with Dr. Badre.

Chavez denied having any mental health issues, but this was inconsistent with his past diagnoses and current medications, Trazodone and Depakote. Trazodone is typically prescribed for anxiety relief and sleep, and

Depakote is typically prescribed for more serious mental health disorders such as bipolar disorder and is often used as a mood stabilizer.

Dr. Shaw administered the Montreal Cognitive Assessment, a brief general cognitive test "initially developed to identify mild cognitive impairment and more progressed cognitive issues like dementia or Alzheimer's." Results indicated that Chavez has mild cognitive impairment.

Based on her first interview with Chavez, Dr. Shaw concluded "that there were clear indicators of psychopathology or mental health symptoms. But because of how difficult it was to collect history from him and because of really his lack of insight into his mental health symptomology, it was difficult to fully clarify diagnosis. But there appeared to be a mood issue. So it appeared to be symptoms consistent and bipolar disorder, mania. And there also appeared to be symptoms with more psychotic types of processes so delusional thought processes and disorganized thinking." She further opined: "I think particularly from the more psychotic-type processes, the delusional types of thinking, the more irrational thought processes, it makes it difficult for him to work appropriately with his attorney. I think he has distorted belief about the case against him, people working against him. I think he has distorted beliefs about [defense counsel's] role as his attorney, all of which I think are very much tied to his mental health symptoms." Although Chavez had "a cursory understanding" of the legal process, there were "strong indicators of more of an irrational understanding of some of the criminal proceedings," and he held distorted ideas.

After interviewing Chavez a second time, Dr. Shaw's opinion remained the same.

## 2. *Dr. Badre's Testimony*

Dr. Badre has conducted more than one thousand forensic competency examinations over the course of his career. In 2022, Dr. Badre found that 50 percent of the people he had evaluated were incompetent, and 50 percent were competent, which is a much higher rate of incompetency than average, likely because he tends to be assigned some of "the sickest" inmates.

There is no recommendation regarding a preferred method for meeting with a patient to be evaluated. Dr. Badre acknowledged that conducting evaluations by video rather than in person could impair his ability to observe symptoms or communicate with the inmate, but in those instances, he "may decide to then see the defendant in person." He "didn't feel the need to do so in this case," however, because he "felt like [he] could see and hear [Chavez] well."

During his first interview, Chavez answered many of Dr. Badre's questions in a pattern that was " 'rude and manipulative.' " It was Dr. Badre's opinion that Chavez's answers to some of his questions—such as saying "everywhere" when asked where he had been raised, "everyone" to the question of who had raised him, and "what does the word 'income' and 'money' mean," when asked about his employment—were "deliberate attempts to be uncooperative." When Dr. Badre asked Chavez why he was being uncooperative, Chavez responded that he "wanted his discovery," "was trying to delay his case," and "did not want to go to prelim." Chavez's statements suggested that he was acting intentionally and not in a way that was "secondary to mental illness." Dr. Badre explained: "Competency is not just, are you able or not to answer questions related to court proceedings? It is, is the reason why you are not [answering questions] mental illness?" "If you are choosing not to answer questions, or answer them in a ridiculous

6

way, that does not make you mentally incompetent. It may make it very hard for you to assist your attorney, and the attorney may be very distressed, but that does not make you incompetent."

Dr. Badre observed after his first interview with Chavez that he was calm, and not distressed or exhibiting any symptoms of mental illness, but rather "had antisocial traits" and "was noncompliant." Dr. Badre's conclusion regarding Chavez's competency was that he "was making a choice, and that he could choose to be able to assist his attorney, and that as far as [Dr. Badre] knew, he was able to understand his court proceedings and assist his attorney if he chose to."

Dr. Badre disagreed with Dr. Shaw's assessment of Chavez as possibly having "schizo spectrum disorder" or bipolar disorder, stating: "Based on my assessment, he is not psychotic. And based on my review of the record, he does not have a history of psychosis." Unlike Dr. Shaw, Dr. Badre believed that Chavez being prescribed Trazodone and Depakote was inconsistent with mental illness because "they are not medications for psychosis."

Chavez was "much more willing to answer questions" in his second interview with Dr. Badre. During that evaluation, Chavez said he had been in prison for violating his probation, which he had received as a result of plea agreement that resulted in a strike. He then went to prison a second time for another offense to which he had pled guilty, which allowed him to avoid receiving a third strike. Chavez's ability to speak logically about his prior legal proceedings further supported Dr. Badre's conclusion that Chavez was competent, as he "was able to speak in a sort of intelligent and eloquent way about these complicated topics." The fact that it seemed many of Chavez's comments were also accurate was "even more reason to think that he is competent."

7

Dr. Badre concluded that Chavez was malingering in his second interview because he "clearly told [Dr. Badre] he was malingering." "[I]t felt clear that despite him refusing to endorse symptoms of mental illness, he was clearly having an intent to use mental illness to get to the state hospital." Dr. Badre further explained: "During the first evaluation, I did not call him 'malingering' because I felt like his presentation was best captured by just him being uncooperative. I did not think a lot of things he was saying were credible. But to me, that is a big difference than malingering, as it seemed like the intent was just to be uncooperative. He was laughing at me. He was not trying to mislead me, he was just not participating." During the second interview, Chavez admitted to Dr. Badre that he had been "intentionally difficult" in the first interview, as he was "trying to figure things out for his case. He was trying to delay his case."

Chavez also gave competent answers indicating his understanding of criminal charges and concepts during his second evaluation with Dr. Badre. He was cognizant of the roles of the trial court, the prosecutor, and defense counsel, and he generally understood what a plea bargain is. Dr. Badre therefore concluded that Chavez could assist in his own defense if he chose to do so, and that he had an understanding of the proceedings against him.

3. *Trial Court's Competency Finding*

After hearing closing arguments from counsel, the trial court made its ruling. The court first noted that "the law presumes that a defendant is mentally competent," and "to overcome this presumption, the defendant must prove that it is more likely than not that the defendant is now mentally incompetent because of a mental disorder." A "defendant is mentally competent to stand trial if he can do all of the following: understand the nature and purpose of the criminal proceedings against him; assist in a

8

rational manner his attorney presenting his defense; and understand his own status and condition in the criminal proceedings."

The court concluded that Chavez had not overcome the presumption of mental competence: "I think he can assist in a rational manner his attorney. I think he understands the nature of the criminal proceedings and his own status. Now, whether he chooses to do so is a different issue. But I'm satisfied that he is mentally competent to stand trial. So that is my finding. I think he is to some extent malingering, and that's his choice also."

B. *Trial*

1. *The Prosecution's Case*

In October 2022, H.M. parked his car outside a 7-Eleven in San Diego and went inside to get a cup of coffee. When he returned to his car, he saw that one of his side windows was broken and Chavez was sitting in the driver's seat. Chavez was "doing all kinds of work on it," pulling apart the dashboard and console components. The vehicle's hood was open as well, and Chavez had "started working on the engine" and "pulled a lot of stuff out."

H.M. asked Chavez what he was doing and told him he was breaking into H.M.'s car, and Chavez replied, "This is my car." H.M. responded, "No, this is not your car." He then found a paper with his name on it, and said to Chavez, "Here, this is my name, so this is -- this is not your property."

H.M. called his roommate V.M., who arrived on the scene. V.M. and Chavez got into a physical confrontation, and both of them hit each other. V.M. called the police.

At some point, Chavez began pulling things out of another nearby vehicle that he had also broken into and damaged, and he was putting them in H.M.'s car. Chavez took a black backpack out of H.M.'s car, which H.M. snatched from him because his son had given it to him. Chavez pulled the

9

backpack back, then reached inside and took out a jumper cable belonging to H.M. that had a three-pound battery charger attached to it. Chavez swung the battery pack at H.M. three times. H.M. tried to use his hands to block Chavez, but Chavez hit H.M. over the head with the battery pack twice. H.M. was bleeding from the injury and went to a hospital in Tijuana, where he received six stitches to close the wound.

Two women working in a nearby store also saw Chavez breaking into the cars and called the police. One of them went outside to tell Chavez that he needed to leave and that they had called the police. Chavez "looked at [her] really scary," followed her back to the store and tried to force his way in, with her holding the door closed against him. The police arrived, tackled Chavez to the ground, and handcuffed and arrested him.

After Chavez was arrested, the police recovered a black backpack and found insurance paperwork inside that belonged to the owner of the other nearby vehicle Chavez had broken into. It cost H.M. around $800 to get his car fixed, and the damage to the other car was estimated at $1,125.

2. *The Defense*

Chavez testified on his own behalf. He broke into two vehicles on the day in question with the intent of getting arrested. When H.M. returned to his car, he and Chavez had a back and forth and Chavez told him to call the police. Chavez then began gathering his belongings he had placed in H.M.'s car, including a backpack, a sweater, and the hammer he used to break the car window. While doing that, Chavez was blindsided by V.M., who almost knocked Chavez unconscious. V.M. then went back to the 7-Eleven.

As Chavez was trying to apologize to H.M. and was about to leave, H.M. grabbed the backpack from him and said it belonged to him. When H.M. snatched the backpack, a jumper cable set fell out. Chavez told him,

10

"Look, Homie, you're not going to fuck me up. You're trying to steal my shit. Just give me my shit. I'm 'bout to leave." The two argued about who owned the jumper cable set, and as H.M. tried to reach for the jumper cables, Chavez snatched the backpack back. The two nearly tripped over each other, and H.M. "ended up hitting himself with his own momentum and his own weight." Chavez stated: "[T]hat's how [H.M.] got hit in the head. I did not swing it at him. I did not hit him. I did not even do anything."

### 3. *Jury Instructions*

At the close of evidence, the parties convened with the court to discuss jury instructions. Defense counsel requested that the court instruct the jury using CALCRIM No. 3404, which states that the defendant is not guilty of the charged crime if he acted without the intent required for that crime, and instead acted accidentally. The prosecutor argued that the accident instruction did not apply because it was already covered by the intent element of the instruction on assault. She further argued that the additional instruction on accident would be confusing to the jury, as the instruction regarding the crime "says it is not required that he or she intend to break the law, hurt someone else or gain any advantage for that."

The court agreed, stating: "Yeah. I'm going to deny 3404. I don't think it has application in this case. The instruction for assault covers the elements. This would be confusing for the jury. So I'll deny 3404 over Defense objection."

### 4. *Closing Arguments*

Counsel gave their closing arguments after the court instructed the jury. During the prosecutor's rebuttal, she asserted that defense counsel had misstated certain testimony in her closing argument, stating: "That's always

11

the new defense. When you don't have one, you say, 'Oh --'" Defense counsel objected as to improper argument, and the court overruled the objection.

After the court sent the jury to deliberate, defense counsel clarified her objection, stating, "My objection was to the language, quote, 'That's the new defense argument when you don't have a defense.'" Defense counsel further stated: "I think that it's possible a curative instruction would be appropriate, given that there are several cases that say that a prosecutor commits misconduct if he or she attacks the integrity of Defense counsel or -- and I think this is the important part -- casts aspersions on Defense counsel. . . . I think [the prosecutor] is also testifying to the jury about her experience in other cases, which were facts outside this jury's access. And I think that saying the words, in your closing argument as a prosecutor, 'When you don't have a defense' -- you can fill in the blank, is generally bad. But saying, This is what all of them do, is particularly derogatory. And I don't think that that type of testimony should be permitted or allowed to be before the jury, who may now go back there and say, Well, she's right, all the defense attorneys do it as she told us they do."

The prosecutor denied any wrongdoing: "I did not say that nor did I cast any aspersions on it [*sic*]. I did not -- I don't -- I did not say that at all. I did not say all Defense attorneys do this. I did not say -- I said -- the new Defense argument, meaning new, as if she just presented it or talked about the lack of video. I was specifically addressing her raising the issue of video surveillance, lack of video surveillance. [¶] And then I wanted to clarify to the jury that Alonzo did check for the video surveillance. And there was also some suggestion that there was video, but the -- that we somehow didn't collect. But I think the store employees' testimony was very clear, that it did not cover where the crime occurred. [¶] I -- at no point did I say any of the

12

things that she described about saying, This is what all Defense attorneys do. I didn't talk about any prior cases. I didn't make any reference to that for that at all [*sic*]. I didn't think it was taken that way even in the context of it."

The court responded, "I don't think there was any intent to impugn the intent on the defense's part or you as an individual. I think the comment was made that -- the way I took is that the new defense or the defense says because you don't have a video, somehow something is lacking."

Defense counsel further argued that the prosecutor's argument did not make sense. "[A]t what other point in this case would [I] have had an opportunity to make an argument except this one? So saying, Oh, I was just calling it her new argument; new argument compared to what? This is the only argument I make in the case. That's not what she was saying. [¶] And I think if we have access to the phraseology, it will be clear that what she said was, That's the new Defense argument when you don't have a defense. That doesn't just apply to me."

The court responded, "Even if that's what she said -- and it's not inappropriate to say that if -- and this is not an inappropriate argument to make, that the -- the defense may attack the police; if that doesn't work, then they attack the facts; or if that doesn't work -- and that's -- that's an appropriate argument to make. [¶] You were making an argument that the DA was withholding evidence, apparently, right? That there was evidence she could have presented that she didn't that was important to the case, that's what you suggested to the jury, and that could be taken to impugn the integrity of the other attorney. But that's a fair argument to make because you think that should have been called and that was important in the case. I don't think that -- I don't think you were trying to personalize it."

13

Defense counsel stated, "The standard that prosecutors are held to is different. And the case law is clear that making comments about the defense attorney -- which is what this was, it had nothing to do with the case -- are not allowed. [¶] I'll submit. I think I made my record and the cases are clear." The court again overruled the objection.

5. *Jury Verdict and Sentencing*

The jury ultimately found Chavez guilty of assault with a deadly weapon (§ 245, subd. (a)(1); count 1), burglary (§ 459; count 2), vandalism over $400 (§ 594, subds. (a), (b)(1); count 3), vandalism under $400 (§ 594, subds. (a), (b)(2)(A); count 4), and misdemeanor resisting an officer (§ 148, subd. (a)(1); count 5). The jury further found that Chavez personally inflicted great bodily injury in committing the assault (§ 12022.7, subd. (a)) and personally used a dangerous and deadly weapon (§ 1192.7, subd. (c)(23)). The trial court found that Chavez had a prior serious felony conviction (§ 667, subd. (a)) and two prior strike convictions (§ 667, subds. (b)-(i); § 1170.12). The court also found four aggravating factors.

The court struck one prior strike conviction relating to the assault, and both prior strike convictions as to the remaining counts. The court sentenced Chavez to a total of 14 years in prison, which consisted of the six-year midterm on count 1; a concurrent two-year term on count 2; a concurrent two-year term on count 3; six-month terms each on counts 4 and 5 with credit for time served; and three years for the great bodily injury enhancement and five years for the prior serious felony enhancement.

14

DISCUSSION

A. *Chavez Forfeited His Claim that Dr. Badre's Testimony Could Not Constitute Substantial Evidence of Competency*

Chavez first contends that the judgment must be reversed because the trial court's finding of competency was error because Dr. Badre conducted a virtual examination of Chavez rather than an in-person examination. We agree with the People that Chavez forfeited this contention by failing to raise it with the trial court.

Evidence Code section 353, subdivision (a), provides that no finding shall be set aside, nor any judgment reversed, based on erroneous admission of evidence unless the record shows "an objection . . . was timely made and so stated as to make clear the specific ground of the objection." The failure to make a timely and specific objection "on the ground asserted on appeal makes that ground not cognizable." (*People v. Partida* (2005) 37 Cal.4th 428, 433–434 (italics omitted); see also *People v. Mixon* (1990) 225 Cal.App.3d 1471, 1479 [citing Evidence Code section 353 and concluding that defendant forfeited his due process argument about his competency hearing because he "failed to make a timely objection" to the trial court]; *In re Cheryl E.* (1984) 161 Cal.App.3d 587, 603 ["A party on appeal cannot successfully complain because the trial court failed to do something which it was not asked to do[.]"].) We therefore conclude Chavez's failure to object to Dr. Badre's testimony at the competency hearing renders his challenge forfeited.

Chavez seeks to avoid this conclusion by labeling his argument as a claim that the competency finding was not supported by substantial evidence. A lack of substantial evidence argument is an exception to the general rule that arguments not made to the trial court are forfeited on appeal. (*People v. Butler* (2003) 31 Cal.4th 1119, 1126.) The substance of Chavez's argument,

15

however, is that Dr. Badre's testimony *cannot* constitute substantial evidence because his evaluations were conducted by video, and thus should not have been considered—i.e., admitted—by the trial court. This is a contention that *is* forfeited if not raised to the trial court. (*People v. Alvarez* (1996) 14 Cal.4th 155, 186.) And even if not forfeited, Chavez's challenge to the reliability of Dr. Badre's testimony goes to its weight, not its admissibility. (*People v. Merriman* (2014) 60 Cal.4th 1, 57 ["the reliability of a witness's testimony is a matter for the [trier of fact] to decide and therefore concerns the weight of the evidence, and not its admissibility"]; *People v. Anderson* (2001) 25 Cal.4th 543, 587 [concluding that once witness was deemed qualified to testify, the reliability of her testimony "went to the weight of the evidence, not its admissibility"].)

To the extent Chavez is raising a sufficiency of evidence argument, we are not persuaded. Though Chavez contends Dr. Badre's testimony was "not substantial" because it was based on virtual rather than in-person examinations, he does not attack the substance of Dr. Badre's testimony. Dr. Badre is an experienced psychiatrist employed as the director of forensic training at the University of California, San Diego, where he teaches classes on competency, and he has completed "over a thousand" forensic competency evaluations. He testified at length about the general process of conducting competency evaluations, his evaluations of Chavez, his disagreement with Dr. Shaw's assessment of Chavez, and why he concluded Chavez was competent to stand trial. Specifically, Dr. Badre concluded after the first evaluation that Chavez "was making a choice, and that he could choose to be able to assist his attorney, and that as far as [Dr. Badre] knew, he was able to understand his court proceedings and assist his attorney if he chose to." He came to that conclusion based on "the fact that [Chavez] was choosing not

16

to participate [in the interview], and that [Dr. Badre] had not elicited any symptoms of mental illness." Dr. Badre further stated: "I felt like in the second evaluation, [Chavez] was answering mostly, you know, appropriately. He was answering the way a nonmentally ill person does and in a way that a nonmalingering person does." Dr. Badre ultimately concluded: "I thought that either way you looked at it, Mr. Chavez was competent. [¶] . . . [¶] My opinion was he could choose to assist his attorney, and that he had an understanding of his court proceeding."

Dr. Badre acknowledged that conducting evaluations virtually could impair his ability to observe symptoms or communicate with the inmate, and in those cases, he "may decide to then see the defendant in person." He "didn't feel the need to do so in this case," however, because he "felt like he could see and hear [Chavez] well." Moreover, Dr. Badre was "quite reassured" that his evaluation of Chavez was accurate and that Chavez was "not disorganized" after observing him in person throughout the competency hearing.

Based on the record before us, we conclude that substantial evidence supported the trial court's finding of competency.

B. *The Trial Court Did Not Err in Denying the Proposed Pinpoint Instruction*

Chavez next contends the trial court's refusal to instruct the jury with CALCRIM No. 3404 after it was requested by defense counsel was prejudicial error. The People argue that no error occurred because the instruction was adequately covered by, and superfluous to, other instructions given to the jury. We agree with the People.

Defendants are entitled, on request, to additional instructions that "pinpoint" a theory of the defense case. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1142 (*Gutierrez*).) But the Supreme Court has held that the trial court

17

may properly reject a pinpoint instruction "if it is duplicative or potentially confusing." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1276 (*Gonzales*) [affirming trial court's denial of defendant's proposed pinpoint instruction where instruction was duplicative and would have required the jury to parse different formulations]; *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 499 (*Mora and Rangel*) [trial court did not err by denying defendant's requested instruction as duplicative].) "Put another way, '[t]here is no error in a trial court's failing or refusing to instruct on one matter, unless the remaining instructions, considered as a whole, fail to cover the material issues raised at trial.'" (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1174; see also *People v. Canizalez* (2011) 197 Cal.App.4th 832, 856–857 (*Canizalez*) ["[W]here standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused."].) We review the trial court's denial of the requested pinpoint instruction for abuse of discretion. (*Mora and Rangel*, at p. 497.)

Here, Chavez requested pinpoint instruction CALCRIM No. 3404, which would have instructed the jury: "The defendant is not guilty of [assault with a deadly weapon] if he acted without the intent required for that crime, but acted instead accidentally. You may not find the defendant guilty of [assault with a deadly weapon] unless you are convinced beyond a reasonable doubt that he acted with the required intent." (See *People v. Anderson* (2011) 51 Cal.4th 989, 996.) The court refused the instruction, finding that it would be confusing to the jury and was unnecessary because "[t]he instruction for assault covers the elements." This was not error.

The trial court instructed the jury with CALCRIM No. 875, which informed the jury that to find Chavez guilty of assault with a deadly weapon under section 245, subdivision (a)(1), it had to determine that he "did an act

18

with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person" and that he "did that act willfully." It further instructed the jury that someone "commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage." The trial court also instructed the jury that the crimes and allegations asserted against Chavez "require proof of the union, or joint operation, of act and *wrongful intent*" (CALCRIM No. 252, italics added), that a "person acts with *wrongful intent* when he or she *intentionally* does a prohibited act" (*ibid.*, italics added), and that someone is guilty of personally using a "deadly or dangerous weapon if he or she *intentionally*" (1) displays the weapon in a menacing manner or (2) hits someone with the weapon (CALCRIM No. 3145, italics added). These instructions thus apprised the jurors that to convict Chavez of assault with a deadly weapon, they must find that he acted on purpose, not accidentally.

CALCRIM No. 3404 was unnecessary because other instructions, including CALCRIM No. 875, adequately informed the jury of this point. (*Gonzales, supra*, 54 Cal.4th at p. 1276; *Canizalez, supra*, 197 Cal.App.4th at pp. 856–857.) If the jury had credited Chavez's testimony that he never swung the battery pack at H.M., that would have precluded a finding that he acted willfully. The requested pinpoint instruction was therefore redundant, and the trial court did not err in refusing it.

Moreover, the Supreme Court has repeatedly concluded the refusal of requested pinpoint instructions was harmless in cases where counsel's arguments pinpointed the defense theory and the instructions given were accurate and complete. (See *Gutierrez, supra*, 28 Cal.4th at p. 1144 [no prejudice where standard instructions "adequately covered the valid points in

19

the proposed pinpoint" and "counsel's argument to the jury fully explicated the defense theme"]; *People v. Hughes* (2002) 27 Cal.4th 287, 363 ["Any lingering doubt that we could have concerning a reasonable juror's understanding of the [issue] is dispelled by defense counsel's unrebutted closing argument, in which he emphasized and 'pinpointed' for the jury the defense theory . . . ."].)  Here, the concept of willfulness was set out in other instructions, and defense counsel further pinpointed the defense's theory of accident in her closing argument: "You also heard from Mr. Chavez, who . . . . described a struggle for the bag, the backpack that he testified he believed was his and [H.M.] testified that he believed belonged to [H.M.], and that *that struggle resulted in an accidental injury*.  So Mr. Chavez's testimony shines light on an element of CALCRIM 875.  That's the CALCRIM that describes assault with a deadly weapon.  And the element would be that the act that was committed has to be willful.  Mr. Chavez's testimony is that it was not.  And for that reason, I will ask you to find him not guilty."  (Italics added.)

Thus, even assuming the trial court erred, we conclude that Chavez has not shown prejudice.

C.  *The Prosecutor Did Not Commit Misconduct*

Chavez next contends that the prosecutor committed prejudicial misconduct during her closing argument by casting aspersions on defense counsel and essentially testifying that Chavez did not have a defense.  The People respond that the prosecutor's remarks fairly commented on the state of the evidence and, even assuming any impropriety, were far too mild to constitute misconduct.  We again agree with the People.

Under state law, a prosecutor who uses deceptive or reprehensible methods to attempt to persuade the jury has committed misconduct, even if

20

the prosecutor's improper remarks do not render the trial fundamentally unfair. (*People v. Lamb* (2024) 16 Cal.5th 400, 435–436 (*Lamb*).) "The prosecution is given wide latitude during closing argument to make fair comment on the evidence, including reasonable inferences or deductions to be drawn from it." (*People v. Harris* (2005) 37 Cal.4th 310, 345.) A prosecutor commits misconduct, however, if she " 'attacks the integrity of defense counsel, or casts aspersions on defense counsel.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 442.) A defendant arguing prosecutorial misconduct must demonstrate that, when considering the whole argument and all jury instructions, there was a reasonable likelihood the jury understood or applied the prosecutor's comments in an improper or erroneous manner. (*Lamb*, at p. 436.)

During her rebuttal closing argument, the prosecutor stated, "They're trying to point to some Boogie Man, [V.M.], as this big piece of evidence that you're missing, forgets about the fact that no one puts him at any of these actual crimes. . . . It misstates the testimony about the video cameras. That's always the new defense. When you don't have one, you say, 'Oh --." Defense counsel explained that she objected to the prosecutor stating, "That's the new defense argument when you don't have a defense," because it cast aspersions on defense counsel and because the prosecutor was essentially testifying that, based on her experience outside of this case, it was her opinion that Chavez did not have a defense.

We conclude that the prosecutor properly argued that Chavez's testimony regarding V.M.'s involvement in the crimes was uncorroborated, and it did not cast aspersions on defense counsel to suggest to the jury that Chavez was attempting to place the blame on a witness not present at trial because he had no other defense. Such an argument does not impugn defense

counsel's integrity, and "[i]t is not misconduct for a prosecutor to argue that the defense is attempting to confuse the jury." (*People v. Kennedy* (2005) 36 Cal.4th 595, 626–627 (*Kennedy*) [finding no prosecutorial misconduct where defendant asserted "that the prosecutor improperly 'vouched for his case' by telling the jury that defense counsel's 'idea of blowin' smoke and roiling up the waters to try to confuse you is you put everybody else on trial' "], disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.)  Here, as in *Kennedy*, "the record does not support defendant's characterization of the prosecution's statement as attacking the integrity of defense counsel." (*Id*. at p. 627.)  We therefore conclude there was no misconduct.

DISPOSITION

The judgment is affirmed.

BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.

22